Of Counsel:
GALIHER DeROBERTIS ONO
Law Corporations

GARY O. GALIHER       2008
L. RICHARD DeROBERTIS  3179
JEFFREY T. ONO          2763
610 Ward Avenue, Second Floor
Honolulu, Hawaii 96814-3308
Telephone: (808) 597-1400
Facsimile: (808) 591-2608

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN RE:<br>HAWAII FEDERAL ASBESTOS CASES<br><br>This Document Applies To:<br><br>MERCY S. BYINGTON, individually and as Personal Representative of the Estate of JIMMY F. BYINGTON, deceased, EVELINE SHORT, and BEVERLY ANN HAUOLI ANI, as Prochein Ami for MARGARET BARBARA HA'EHA'E ANI, a minor,<br><br>          Plaintiffs,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | CIVIL NO. CV04 00661 REJ BMK<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S NOTICE OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT; CERTIFICATE OF SERVICE<br><br>Judge: Hon. Robert Jones |

D:\04499.1\pleading\federal\et mem opp usa msj 11.27.06.doc

# TABLE OF CONTENTS

I.    PREFACE ..........................................................................................1

II.   NINTH CIRCUIT LAW ON THE
      DISCRETIONARY FUNCTION EXCEPTION ............................1

III.  FACTS ...............................................................................................5

      A.    Mandatory Air Force Regulations ......................................5

      B.    The USA Retained Authority on
            Asbestos Abatement ..............................................................8

IV.   LANDOWNDER LIABILITY IS ALLOWED
      UNDER THE FTCA .......................................................................22

V.    THE CASES USA RELIES UPON ARE ALL
      DISTINGUISHABLE ....................................................................24

VI.   CONCLUSION ...............................................................................26

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Ara Leisure Services v. U.S.*
    831 F.2d 193 (9th Cir. 1987) ........................................................................5

*Corbett v. Association of Apartment Owners,*
    70 Haw. 415, 772 P.2d 693 (1989) ......................................................24

*Duff v. U.S.,*
    999 F.2d 1280 (8th Cir. 1993) ..........................................................25

*Gibo v. City and County,*
    51 Haw. 299, 459 P.2d 198 (1969)....................................................24

*Hagy v. U.S.,*
    976 F.Supp. 1373 (W.D Wash. 1997) .............................................25

*In Re Glacier Bay United Cook Inlet Drift Assoc.,*
    71 F.3d 1447 (9th Cir. 1995) ...........................................2-3, 4, 5

*Lumpkins v. U.S.,*
    187 F.Supp 2d 535 (D.Md. 2002) .....................................................24

*McGarry v. U.S.,*
    549 F.2d 587 (9th Cir. 1976) .......................................................22-23

*Orr. v. U.S.,*
    486 F.2d 270 (5th Cir. 1973) .............................................................23

*Pickard v. City & County,*
    51 Haw. 134, 452 P.2d 445 (1969)....................................................24

**Page**

*Prescott v. U.S.,*
   973 F.2d 696 (9th Cir. 1992) ...................................................................1-2, 8

*Schmid v. U.S.,*
   273 F.2d 172 (7th Cir. 1958) ..................................................................23-24

*Tyni V. United States,*
   slip opinion, Civil No. 99-907 (D.Haw. Nov 5, 2001) ...........................24-25

*Valdez v. U.S.,*
   56 F.3d 1177 (9th Cir. 1995) .........................................................................8

Weiss v. U.S.,
   787 F.2d 518 (10th Cir. 1986) .....................................................................23

**Regulations**

40 C.F.R. §61 ................................................................................................. 18

40 C.F.R. §61.141 .......................................................................................... 18

**Other**

Air Force Instruction 32-1052 ........................................................................ 7

Air Force Regulation 91-42 .............................................................6-7, 16, 17

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO UNITED STATES
OF AMERICA'S NOTICE OF MOTION TO DISMISS PLAINTIFFS'
COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT, AND MEMORANDUM IN SUPPORT**

## I.    PREFACE

Defendant United States of America ("USA") has moved to dismiss Plaintiffs' claims on the purported grounds of the discretionary function exception to the Federal Tort Claims Act. Jimmy Byington's family's claims against the USA are based upon premises liability of the USA as the owner of the buildings where Jimmy worked at Hickam Air Force Base ("Hickam AFB").

The entire premise of USA's Motion is that the United States Air Force ("USAF") delegated asbestos abatement decisions to the Hawaii Air National Guard ("HIANG"). The USA's Motion must be denied because this is simply not true. The documents produced by Hickam AFB show that the USAF (1) recommended to HIANG to *not* engage in asbestos abatement and (2) refused to issue an asbestos hazard assessment, despite mandatory regulations that it was not proper to leave flaking asbestos in place. These facts require the denial of USA's motion.

## II.    NINTH CIRCUIT LAW ON THE DISCRETIONARY FUNCTION EXCEPTION.

It is well settled that the government bears the burden of establishing the discretionary function exception. *Prescott v. U.S.*, 973 F. 2d 696, 702 (9th Cir.

1992) ("We thus hold explicitly that the United States bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity.")  Moreover, to meet its burden, there must be a particularizing and fact-specific inquiry "into the discretionary function issue." *Id.* at 702-703.  The USA has not met its burden herein.

The applicable Air Force Regulations mandated that all damaged friable asbestos be removed or repaired.  Being ignored and left unfixed was not an option.  Moreover, the historical documents do not establish that Hickam AFB assigned total responsibility to the Hawaii Air National Guard.  Rather, the documents showed that Hickam AFB Bioenvironmental Engineer ("BEE") maintained control and responsibility of what was deemed to be an asbestos hazard.  In fact, the BEE obstructed asbestos repairs to Building 3400 and made his decisions using the wrong definition of "friable."

*In Re Glacier Bay United Cook Inlet Drift Assoc.*, 71 F.3d 1447 (9th Cir. 1995), is a thorough analysis of the Ninth Circuit law on the discretionary exception.  *Glacier Bay* further explains how scientific judgment is <u>not</u> the type of social, economic or political policy the discretionary function protects.  As the Ninth Circuit explained:

> It is by now firmly established that the determination whether the exception applies requires a two-step analysis.  First, does the challenged action involve an

2

> element of choice or judgment?  If not, when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the exception will not apply.  *Kennewick Irrigation Dist. v. United States 880 F.2d 1018, 1025 (9th Cir. 1989) (quoting Berkovitz v. United States, 486 U.S. 531, 536, 100 L. Ed. 2d 531, 108 S. Ct. 1954 (1988)).*  Second, is any judgment at issue of the sort Congress intended to shield?   If the judgment involves considerations of social, economic or political policy, the exception applies.  *Sutton v. Earles, 26 F.3d 903, 907 (9th Cir. 1994); Summers v. United States, 905 F.2d 1212, 1214 (9th Cir. 1990).*  This is so because it is precisely those sorts of decisions that Congress sought to shield from judicial second-guessing.   *Kennewick, 880 F.2d at 1022-23; United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 81 L. Ed 2d 660, 104 S. Ct. 2755 (1984).*  When the record does not show that a decision is based on such policy considerations, the exception does not apply. *Summers, 905 F.2d at 1215.*

*Id.* at 1450.

The Ninth Circuit further explained that each act must qualify for the discretion function exception:

> . . . the proper level of inquiry must be act by act. Under *Berkovitz* and *Kennewick*, we must determine whether *each* person taking an allegedly negligent action had discretion. *Kennewick, 880 F.2d at 1025 . . . .* The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance.  Each separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield.

3

*Id.* at 1451.

The Ninth Circuit further explained:

> We reject the district court's conclusion that the government cannot be liable for the final product of numerous specific actions, even if some of the actions were nondiscretionary and negligently executed, so long as others of those actions involved discretion.
>
> It remains possible that because NOAA supervisors ultimately approved the surveys in question, Trinidad may not be able to show any alleged hydrographer errors actually caused them injury. That issue, however, is one of proximate cause. Issues of negligence are irrelevant to the discretionary function inquiry, and we need not consider them at this juncture. *Routh v. United States, 941 F.2d 853, 855 (9th Cir. 1991).*

*Id.* at 1451.

The Ninth Circuit explained that violations of internal guidelines are not shielded by the exception:

> The government implies that these guidelines might not be binding for purposes of the discretionary function inquiry. Our prior precedents dictate otherwise. *See Faber v. United States, 56 F.3d 1122, 1126 (9th Cir. 1995)* (analyzing internal agency guidelines to determine whether they permit discretion); *Summers, 905 F.2d at 1214-15* (same); *ARA Leisure Servs. v. United States, 831 F.2d 193, 195 (9th Cir. 1987) (same).*

*Id.* at 1452 n. 1. This specifically applies to safety decisions made under

established policy. *ARA Leisure Services v. U.S.*, 831 F. 2d 193, 195 (9th Cir. 1987) ("We agree . . . that 'where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees'.").

The Ninth Circuit explained that decisions made on scientific standards are not protected:

> Decisions involving the application of objective scientific standards . . . are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy. *Kennewick, 880 F.2d at 1020.*

*Glacier Bay*, 71 F.3d at 1453.

## III.  FACTS

### A.    Mandatory Air Force Regulations

The facts herein reveal that Hickam AFB had a mandatory requirement under Air Force regulations to either remove or repair the damaged asbestos in Building 3400 and the other buildings leased to the Hawaii Air National Guard. While some documents indicate the HIANG was responsible for the "cost" of this asbestos repair, the decisions on what to do and when to do it

remained with Hickam AFB and its bio-environmental engineer.

The USA concedes that the 1994 study was pursuant to Air Force Regulation 91-42 ("AFR 91-42"). (USA's motion at p. 5:8-10.) AFR 91-42 (Exhibit A) was effective December 21, 1988, which is before Jimmy Byington began work at Hickam AFB. AFR 91-42 (Exhibit A) provides that asbestos must not be allowed to deteriorate and there is a presumption that all damaged asbestos is hazardous and thus all damaged asbestos must be eliminated by either (1) repairing or (2) removing. AFR 91-42 (Exhibit A) provides in pertinent part as follows:

> Section A - policy guidance
>
> 1.    Introduction to the asbestos management program. Air Force facilities have been progressively constructed, altered and repaired with asbestos-containing materials ("ACM") until Air Force policy (AFM 88-15) strictly limited its use. The remaining ACM must not be allowed to deteriorate, become damaged or be disturbed by workers or occupants unless precautions have been taken to prevent exposure to airborne asbestos fibers.  . . . [T]his regulation sets basic requirements for establishing and maintaining [asbestos management] programs . . . .
>
> 2.    Policy guidelines:
>
> a.    Asbestos repair. Asbestos materials in Air Force facilities do not pose an inherent hazard. They are only hazardous in conjunction with a mechanism or event that could cause the material to break up into individual fibers and become dispersed into the breathing environment. However, there is a presumption that all damaged ACM is hazardous

> because of its potential to release airborne asbestos fibers. As
> a result, all presumptive asbestos hazards must be eliminated
> either by repairing or removing damaged ACM.

Therefore, AFR 91-42 mandated that all damaged asbestos material is presumed hazardous and must be eliminated by either repairing or removing. Hickam AFB sadly did neither and had no discretion to take no action and allow occupants of Building 3400 to continue to be exposed to asbestos.

This analysis was not changed by Air Force Instruction 32-1052 ("AFI 32-1052") (Exhibit B) which was effective March 22, 1994 and superseded AFR 91-42. AFI 32-1052 contained the same mandates that "All damaged asbestos containing material is presumed hazardous due to its potential to release airborne asbestos fibers. Damaged asbestos containing material must be repaired or removed to eliminate the potential hazard. Bases will abate the possibility of hazardous asbestos containing material through inventory management, isolation and containment."

A review of some of the documents produced by Hickam AFB reveals that in the mid-1980s Major Roberto Martinez-Perez, the chief bio-environmental engineer was recommending that the asbestos flaking off the rafters in Building 3400 be removed, not merely encapsulated. However, by 1990 there was a new chief of the Bio-Environmental Engineering Services at Hickam AFB–Major

Stephen N. Payne.  Major Payne (1) incorrectly determined that the asbestos was not "friable" although it was flaking off the rafters, (2) opposed any asbestos encapsulation or removal as not necessary and (3) recommended that the flaking asbestos material "be indefinitely managed in place."  (Exhibit C at USAFO1-00276)  Unfortunately, Major Payne's decisions have resulted in the asbestos still remaining in place to this very day and flaking off the rafters in Building 3400.

### B.    The USA Retained Authority on Asbestos Abatement

The USA has the burden of proving the applicability of the discretionary function exception to the FTCA.  *Valdez v. U.S.*, 56 F.3d 1177, 1179 (9th Cir. 1995); *Prescott v. U.S.*, 973 F.2d 696, 701-702 (9th Cir. 1992).  The USA cannot meet that burden when the documents are analyzed, since they reveal the USAF refused asbestos abatement, even in the face of advice that flaking asbestos was unsafe.

The USA appears to concede there may be a duty imposed by Hawaii State law on the USAF as the property owner running to Jimmy Byington as a business invitee, but that is "irrelevant."  (USA Motion at 12 fn. 5 & 18).  The USA claims its duty to Jimmy is irrelevant because it delegated its asbestos safety responsibilities to the Hawaii Air National Guard, the Lessee.  As the documents discussed below show, this simply is not true.

Exhibit C is a collective exhibit of various documents produced by the USA in this litigation and bate stamped by the USA. This is a subset of the 963 pages of documents produced by the government. The documents in Exhibit C have been reordered to be in chronological order and thus they are out of the bate stamped numerical order.

As reflected in the Department of the Air Force memo dated 7 December 1981, the Air Force did the air sampling in Hangar 3400. This 7 December 1981 memo is signed by Marlin L. Sweigart, Major, USAF, BSC OIC, Bioenvironmental Engineering Services. (Exhibit C bate number USAF-01-00284.)

This memo confirms that as early as 1981 asbestos was flaking off inside Building 3400. As stated within the memo:

> 2. During the past month, personnel working in the hangar noticed small pieces of insulation were falling to the hangar floor, probably the result of bird activity. Three separate samples of this debris were collected by us and sent to the Air Force Occupational and Environmental Health Laboratory (OEHL) at Brooks AFB for analysis. Additionally, a breathing air sample was taken and also sent to the OEHL. Results of the bulk samples showed the presence of 0 to 4 percent crysotile (sic) asbestos in the debris and the air sample showed less than the practicable detectable limit of 0.01 fibers/cc present in the worker's breathing zone.
>
> 3. These results were expected since the amount of debris falling is very small compared to the large hangar area

and the large dilution factor caused by the tradewinds blowing through the open hangar.  . . . [W]e will continue to sample in the hangar at least every six months and more often upon request to ensure breathing air samples remain below the Time Weighted Average (TWA) concentration of 2 fibers/cc of air and the ceiling concentration of 10 fibers/cc of air.

4.    If deterioration of the asbestos increases, serious consideration should be given to removing the material or to encapsulating it to prevent fiber release.

Exhibit C at bate number USAF01-00284.

The Exhibit C bate number USAF01-00487-489 is a 2 December 1982 memo from the State of Hawaii Department of Defense to ANGSC/SG/DE at Andrews Air Force Base with a copy to 15ABW USAF Clinic and 15ABW/DEF (which shows this memo was received by the Air Force).  This memo states in pertinent part as follows:

2.    Building 3400, interior hangar roof and structural girders were sprayed with a fire-retardent (sic) composed of a concrete asbestos compound in 1972–73. Since 1978, pieces of insulation have been falling resulting in a possible asbestos exposure problem to personnel working in the hangar.  Careful study of the deterioration revealed three areas of concern all of which are being watched closely:

a.    Air flow.
b.    Birds nesting in structural frame.
c.    Leaking hangar roof (Maintain Roof project completed in FY 81).

3.    The problem is being tracked by the Hickam AFB Bio-Environmental Engineer and the 154 COMPG/SEE. Their results are inclosed (sic). No hazard exists at this time; however, the potential is high and future accelerated deterioration is a certainty.

4.    Present action consists of tracking the insulation "fallout" by the hanger (sic) deck chiefs and the group safety officer. **The BEE will not assign a risk assessment code (RAC) to the hangar because of the air sampling results.** However, a plan for future corrective action must be implemented; now, to prevent undue delay when action is taken.

Exhibit C at bate number USAF01-00488.[*]

The 20 January 1983 memo from the Department of the Air Force Air National Guard Support Center signed by Thomas S. Webb, LTC, USAF, BSC, Chief, Bioenvironmental Engineering states as follows:

1.    We have reviewed the attached correspondance (sic) from the Hawaii ANG. It is apparant (sic) that there is no immediate health hazard due to asbestos in Bldg 3400. However, our opinion is that the hazard risk can only increase; therefore planning for reducing or eleminating (sic) the problem should begin now.

2.    Since the concrete asbestos application is only about ten years old, deterioration . . . may not be excessive. At White Plains encapsulation was not a feasible option due to extensive deterioration, and complete removal was necessary. An extremely expensive project.

3.    We recommend a study be made to determine if encapsulation is an option at this point. If it is, a project for the near future (FY 84-85) should be initiated. If it

_____

[*] All bold emphasis here and throughout this brief is added.

> is not, we would recommend continued monitoring by
> the Hickam Bioenvironmental Engineer until the
> airborne asbestos level reaches one-half the permissible
> exposure limit . . . ; at this point a project for complete
> removal should be initiated.

Exhibit C at bate number USAF01-00283.

The 4 September 1986 memo documents the meeting with Hickam

AFB officers and the Hawaii Air National Guard regarding the decision to remove

or encapsulate the insulation in Building 3400. This memo documents the fact

that the USAF recognized that the asbestos spray on insulation in Building 3400

was friable and breaking. As this memo states in pertinent part:

> 3.    The firm of Casalina & Associates took bulk samples
> which confirmed the presence of Chrysotile asbestos in
> the spray-on material. **Material is in a friable
> condition** and any mechanical agitation would release
> the fibers into the air. Due to climatic conditions in
> Hawaii, the Hangar doors are normally in the open
> position. The combination of tradewinds, birds nesting
> in the structural beams, and spot roof leaks have
> resulted in patches of the substance falling to the floor
> periodically.

> 4.    Major Martinez-Perez mentioned that EPA is really hot
> and heavy on asbestos problems and is emphasizing the
> total elimination of use of asbestos as insulating
> material. **He mentioned that the air sampling should
> not be used as a gauge for treatment.** The material is
> potentially **hazardous in its present state** and action
> must be taken to eliminate the hazard.

> . . .

6.    . . . We need to act now.

Exhibit C at bate number USAF01-00453-454.

The 22 October 1987 memo from Roberto Martinez-Perez, Chief, Bio

Environmental Engineering Services of Hickam AFB states in pertinent part:

> In Bldg 3400, we should be really concerned due to the present condition of the existing material which is known to be delaminating through age and weather action. Our office still believes that the present encapsulation project will only provide a temporary fix. Since the asbestos material will probably have to be removed at a later date, the cost will probably quadruple.

Exhibit C, at USAF01-0019.

This proves the USAF was aware that asbestos was constantly "delaminating" and that the Hawaii Air National Guard needed Hickam AFB to agree on how to solve the asbestos problem.

The July 11, 1988 memo from First Lt. Blazicko, USAF, Deputy Chief, Bioenvironmental Services corroborated the above points—that Hickam AFB was against encapsulation due to the limited 2 year warranty, and wanted to do asbestos removal due to the breaking of asbestos in Building 3400. This memo provides in pertinent part:

> a. In our letter of 22 Oct 87, we asked for a guarantee on the encapsulating work. The contractors responded with a guarantee of only two years. From an economical point of view, the cost of encapsulation does not seem to be justified,

since there are several physical factors at the hangar which are causing the present asbestos to deteriorate:

(1) Constant tradewinds blowing through the hangar at 10 to 20 knots (gusting up to 30 knots), causing the material to flex.

(2) Salt air from the ocean reacting with the encapsulant and breaking down the material.

(3) Building vibrations caused by engine run-ups, and stressing the material.

With these physical agents at work, the encapsulation may not last much past two years, and abatement of the material would have to occur. The encapsulation should have a broader guarantee; e.g., 10 to 20 years, in order to preclude asbestos abatement.

Exhibit C at USAF01-00322.

The 10 March 1988 memo from Lt. Col. Martinez-Perez, Chief

Bioengineering Services states in pertinent part:

3. Representative samples were collected from the air conditioning duct systems located in the hallways in front of rooms 21A and 31A and in room 31A in Bldg 3400. Results obtained from the Pearl Harbor Industrial Hygiene Lab indicated 25% chrysotile asbestos was present. The asbestos presents no health hazard in room 31A and the connected hallway duct system. However, the air conditioning duct located in the hallway adjacent to room 21A is in poor condition and friable asbestos is visible.

4. The air conditioning duct insulation must be repaired in the hallway of 21A. Any projected renovation must be accomplished. IAW USEPA National Emission Standards (40 CFR 61 and OSHA Regulations 1910.1001 and 1926.58).

14

Exhibit C at USADF01-00329.

This proves that Hickam AFB could and did mandate asbestos repair if asbestos was friable, as per Lt. Col Martinez-Perez.  However, by 1990 a new Chief of Bioengineering Services replaced Martinez-Perez, and the new Chief refused to authorize any asbestos abatement in Building 3400, at least with respect to the friable asbestos falling off the hangars.

The 10 April 1990 memo from the Hawaii Air National Guard requested "an asbestos hazard assessment" from the new Hickam AFB Chief Bioenvironmental Engineer.  The new Chief—Major Payne USAF—refused.  The memo states:

> 1.    The Hawaii Air National Guard (HIANG) is currently redesigning its asbestos abatement project within the hangar portion of Bldg 3400.  The fire retardant material applied to the walls and ceiling of the hangar is composed of asbestos containing material (ACM).  The hangar is normally open, with flow-though ventilation, and is closed during inclement weather.   Air sampling has to date recorded acceptable airborne fiber levels.
>
> 3.  **Request an asbestos hazard assessment be conducted** to determine the necessity of this asbestos abatement project. The abatement measure under consideration by HIANG is removal of the ACM within the hangar.  The assessment is required to justify the cost of the work.   Request the assessment be competed NLT 15 May 1990.

Exhibit C at USAF01-00276.

Major Payne refused and mistakenly called flaking asbestos not "friable." Indeed he completely ignored the mandates of AFR 91-42 effective Dec 21, 1988, and erroneously assumed if air samples showed low asbestos fiber counts, then flaking asbestos falling from rafters was no hazard. Major Payne's answer on April 30, 1990 was:

> In its current state I do not consider the subject ACM to be "friable." Also, as you indicate in your letter, past air sampling has not indicated any hazardous levels of asbestos fibers in the building air. Therefore, I do not feel removal is necessary. I recommend the material be indefinitely managed in place.

Exhibit C at USAF01 – 00276.

Naturally, the Hawaii ANG was surprised that Hickam AFB first recommended removal rather than encapsulation, but now with a new Chief BEE, refused to provide an asbestos hazard assessment. Thus, HIANG asked the BEE to re-evaluate in its 27 July 1990 memo which states in pertinent part:

> 2. Before the HIANG cancels our asbestos abatement project (PN KNMD 86004 Remove/Encapsulate Hanger (sic) Insulation, Bldg 3400) altogether, we would like to insure that your office is aware of the history of this project. In the past, abatement was recommended by your office because it was believed that the deterioration of the fire retardant would increase with time and eventually pose a problem. **Removal was preferred due to questions regarding the reliability of an encapsulant**. Then, as now, there was no immediate health hazard from airborne asbestos.
>
> 3. **Request your reevaluation of the hazard** in terms of long

term release potential, as expressed in Atch 5. It is our disposition that if there is a significant probability that the health hazard will increase in the future, we should conduct the removal process now to preempt any safety threats and cost escalations.

Exhibit C, at USAF01-00274.

The "re evaluation" meeting took place on August 8, 1990 between Major Payne, USAF BEE, and Mr. Ito, HIANG Environment Engineer. Major Payne again ignored AFR 91-42 and erroneously refused to admit flaking asbestos was "friable." Thus, Payne refused asbestos removal.

3. Discussed were the following:

a. Clarification of 15 ABW/SGBP response to the HIANG initial request for Hazard Assessment, dated 10 April 1990. Major Payne was asked to clarify his recommendation to manage in place the asbestos in Bldg 3400 in light of the recommendations that had come out of the 15 ABW/SGBP office in the past. Major Payne responded that because the material does not pose a significant hazard at present, or in the foreseeable future, health concerns can not be used as justification for the encapsulation or complete removal of the hanger (sic) asbestos insulation. He has consulted with others knowledgeable (persons) about asbestos and they have given the same recommendations. The only reasons he can see as justification of the complete encapsulation or removal of the hanger (sic) insulation are first, peace of mind, where would remove the asbestos in order to eliminate the possibility of any problems in the future, or second, if we had funds specifically for this type of work that required expenditure.

b. Condition of Asbestos in Hanger (sic). The method of abatement used all depends on how old the insulation is and if it is still in good condition. **He feels that it is in good**

**condition.  It is not friable, in that although you could break it up by hand the insulation itself is rather hard**.  Major Payne said that in his opinion, the material will continue to be in good condition for the next five years.  If we're concerned about some old water damaged areas, he recommends encapsulation of those small damaged areas associated with leaks that occurred prior to the hanger (sic) roof repair.

Exhibit C at USAF01-00272.

Thus Payne stated the asbestos material was "not friable" because although "you could break it up by hand," otherwise it was "rather hard."  But, that is the very EPA definition of friable asbestos.  The EPA's 1985 Guidance for Controlling Asbestos-Containing Materials in Building in its summary states: "Friable material can be crumbled, pulverized, or reduced to powder by hand pressure."  Exhibit D, p. S-1.  Appendix C to the 1985 EPA Guidance Book contains excerpts from 40 C.F.R. 61.    40 C.F.R. §61.141 Definitions state: "Friable asbestos material means any material containing more than 1 percent asbestos by weight that hand pressure can crumble, pulverize, or reduce to powder when dry."  Exhibit D at C-1.

To emphasize Major Payne's error the 28 May 1991 asbestos sample from Building 3400 stated: "1.  Material condition:  Flaking off and falling to the floor.  2.  Location comments:  Exposed beams and underside of corrugated metal roof."  Also, "15% chrysotile asbestos."  Exhibit C at USAF01-00265.  This

analysis was "Requested by Gregory A. Perry, Capt., USAF, Asbestos Program Manager." (*Id.*)

The documents reveal over the next ten years asbestos continued to fall in Bldg 3400 and the dust is heavily concentrated with asbestos.

1. 12 Aug 1997 Dept. of Air Force memo from Capt. Stephanie McCormack-Brown, Deputy Commander, Bioenvironmental Engineering reflects: "In July 97 a bulk sample of dust and debris was collected from the rafters in Bldg 3400." "11 July 97 Dust and Debris Bulk Sample: 30 – 50% Chrysotile Asbestos." (Exhibit C at USAF01-00222.) The "Conclusions/Recommendations" of this memo states:

> a. Although the dust collected from the rafters indicates that the plaster is releasing chrysotile asbestos fibers air sample results that the airborne concentrations are very low.
> . . .
> c. **Air sampling is not adequate for determining the integrity of the plaster**. A visual inspection by the building custodian or the 15th Civil Engineering Squadron will provide a more adequate determination of the plaster integrity. We will no longer conduct routine ambient asbestos air sampling.

Exhibit C at USAF01-00223.

> 2. A series of emails in June 2001 state in pertinent part:
>
> From: Wiederholt Cynthia E. MSgt 15 ADS/SGGB
> Sent: Thursday, June 28, 2001 8:17 AM
> . . .
> The results from the ceiling material is 15% chrysotile, sorry for the delay I just wanted to make sure it was the ACM in

question!  Our recommendation would still be to either have it abated or manage it in place in encapsulation.  Thanks.
. . .

From:  Wiederholt Cynthia E MSgt 15 ADS/SGGB
Sent:  Monday June 25, 2001 7:01 AM
. . .
BEE has records from 1984 to 1991 on this issue, we conducted general area & personnel air monitoring to determine if there were airborne fibers.  While we did not detect any airborne fibers and stated the hangar work area was not a health hazard, **it's still not a good industrial hygiene practice to live with ACM dropping from the ceiling, back in 1984 or now**.  The situation has the potential to be a health hazard, and as I suggested on Friday a health hazard does not need to exist to take action to either manage it or remove it.
. . .

From:  Murata Jody Ann C. GS-07 15 CES/CEVC
Sent:  Friday, June 22, 2001 9:33 AM
. . .
The 154th AGS Aircraft Maintenance Unit supervisor, SMSgt Tachihata, is concerned with asbestos in B.3400.  15 CES/CEVC has sample results dated 28 May 91 from ceiling surfacing material from B.3400 Hangar Bay.  It was reported to be 15% chrysotile.  The material is flaking off and falling to the floor from exposed beams and the underside of the corrugated metal roof.

I visited B.3400 this morning, **and it looks like the situation is the same as it was back in 1991**.  There was ceiling material on the floor, and the **personnel sweep it up every morning and put it in the trash**.  The material also collects in nearby drains, which are cleared out using a leaf blower.  The wind blows through the hangar, which may facilitate the material flaking off the ceiling.
. . .

Exhibit C at USAF01-00210 to 00212.

20

3.    The 10 July 2001 Memorandum from Major Lee, the new Bioengineering Commander states in part as follows:

1. Background.  The fire retardant surfacing material located on the ceiling and high walls of building 3400 are asbestos containing materials (ACM).    Bioenvironmental Engineering (BE) conducted ambient and personal air monitoring from 1981 to 1997 to determine personnel potential exposures, all monitoring results were below the occupational exposure limits. Personnel within this facility, Hawaii Air National Guard, have continuously requested the ACM be abated.  Although historical records indicate the ACM was previously in good condition and not deteriorating, the ACM is now flaking to the hangar floor and the adhesive is failing.

2. Survey.

a.  On 22 June 2001 personnel from BE surveyed the hangar conditions.  Personnel escorted BE through the hangar to display flaking chips of material throughout the hangar and accumulated in drains.  BE collected a sample of the chips from the hangar floor to determine if the material was indeed the ACM from the ceiling and high walls.  Sample results confirmed the chips are ACM.

b.    The ACM is rapidly deteriorating and is significantly damaged, extent of material damaged is greater than one-tenth evenly distributed throughout hangar. **The ACM is friable**.

c.    The hangar area where ACM is falling to the floor, is a high traffic area with various aircraft operations and personnel.

Exhibit C at USAF01-00207.

4.  The February 7, 2002 Concept Design Report states in part as

follows:

> The asbestos-containing fireproofing that is located on the steel beams and metal roof panels **appears to be friable**. For the design options that include the removal of the existing roof and steel framing members, it is our opinion that a complete abatement (inside a negative pressure containment) will be necessary. It will not be feasible to bulk dispose of structural members with abatement limited to glove bag at cut points for disassembly. Because there is a need to contain the friable materials inside the hangar area, demolition and disposal of roof and framing materials cannot proceed unless abatement of friable asbestos materials is completed.

Exhibit C at USAF01-00195.

## IV.    LANDOWNER LIABILITY IS ALLOWED UNDER THE FTCA

A Ninth Circuit case on point is *McGarry v. U.S.,* 549 F.2d 587 (9th Cir. 1976). In *McGarry*, the Ninth Circuit held that the U.S. was liable for the electrocution of an independent contractor's employee at the Nevada Test Site ("NTS"). Under Nevada law, "the employer of the contractor has a duty to exercise reasonable care to see that the contractor takes proper precautions to protect those who might sustain injury from the work." 549 F.2d at 590. The U.S. owned the NTS land and the power line. *Id.* The Ninth Circuit explained if the government ("AEC") "had made regular examinations to ascertain . . . that appropriate guidelines were being followed," then this may have satisfied its duty. *Id.* at 591.

The Ninth Circuit rejected the government's arguments that it delegated all its safety responsibility to the contractor. As explained:

> As a matter of policy, then, the AEC chose to retain some responsibility over matters of employee safety. The meeting of that responsibility was an operational function. The manner in which responsibility was to be met was the subject of decision at the operational rather than the planning level, and accordingly was not an exercise of a discretionary function.

*Id.* at 591.

It is well settled that if state law imposes a duty to a private landowner, then the government has the same duties for land it owns within the state. See eg. *Weiss v. U.S.,* 787 F.2d 518, 525 (10th Cir. 1986) ("Under Colorado law, then, an owner or occupant of land has a general legal duty to exercise reasonable care regarding conditions on his property. Under Section 1346(b) of FTCA, the duty to exercise reasonable care is imposed upon the United States as owner of lands in Colorado.") *Orr. v. U.S.,* 486 F.2d 270, 275 (5th Cir. 1973) ("During the time he was working on Patrick Air Force Base, Orr was an invitee of the United States. As an invitee performing hazardous duties in fulfillment of the Government contract, Orr was owed a high degree of care which could not be delegated."); *Schmid v. U.S.,* 273 F.2d 172, 176-77 (7th Cir. 1958) ("The government, as owner, had the duty under the Illinois Scaffold Act, to see that the

scaffold complied with the Act."); *Lumpkins v. U.S*, 187 F. Supp. 2d 535, 542 (D. Md. 2002) ("It is not clear from the contract alone that WMS's assumption of responsibility for workplace safety encompassed latent defects in the walkway existing prior to the contract between WMS and the government which may have been created by Government agents . . . ").

The law of Hawaii is that landowners owe a duty to all persons on their premises. *Pickard v. City & County*, 51 Haw. 134, 135, 452 P.2d 445 (1969) ("We . . . hold that an occupier of land has a duty to use reasonable care for the safety of all persons reasonably anticipated to be upon the premises, regardless of the legal status of the individual."); *Gibo v. City & County*, 51 Haw. 299, 301, 459 P.2d 198 (1969); *Corbett v. Association of Apartment Owners*, 70 Haw. 415, 417, 772 P.2d 693 (1989) (standard is "unreasonable risk," not "unreasonably dangerous condition").

## V.    THE CASES USA RELIES UPON ARE ALL DISTINGUISHABLE

The principal case the USA relies upon is District Judge Helen Gillmor's Order in *Tyni v. United States*, slip opinion, Civil No. 99-907 (D. Haw. Nov 5, 2001). USA almost gives the impression that *Tyni* held that the USA was not responsible for removing land-based paint at Hickam AFB. In fact, in *Tyni,* the

USA was abating the lead based paint. It was not a building occupant who sued for lead-related personal injuries. Rather, in *Tyni*, it was the abatement worker himself who was injured, not by the lead-based paint, but rather by the chemical "Peel Away" he was applying without using a protective suit. (*Tyni* Order at 7, Exhibit H to USA's Motion.)

Thus, in *Tyni* there was no premise liability claim against the USA for allowing flaking lead paint to remain in place and contaminate building occupants at Hickam AFB. Rather, the *Tyni* plaintiff argued that the USA should have supervised the contractor's employees and forced them to wear the protective suits required by the government contract. Naturally, Judge Gillmor rejected this absurd legal theory. *Tyni* would be on point if Jimmy Byington were an asbestos abatement worker who was removing the flaking asbestos yet failed to wear an air-fed respirator, breathed asbestos dust during abatement operations and contracted mesothelioma a decade later.

Similarly, *Duff v. U.S.*, 999 F.2d 1280 (8th Cir. 1993) and *Hagy v. U.S.*, 976 F. Supp. 1373 (W. D. Wash. 1997) are distinguishable because the Hawaii Air National Guard had no "special expertise" in asbestos safety, and had relied upon the property owner, the USAF and the BEE, for its expertise.

## VI.  <u>CONCLUSION</u>

Based upon the foregoing, there is no discretionary function exception

and the USA's motion herein should be denied.

Respectfully submitted,

/s/ L. Richard DeRobertis
GARY O. GALIHER
L. RICHARD DEROBERTIS
JEFFREY T. ONO
DIANE T. ONO
Attorneys for Plaintiffs