IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

IN RE:                                               )
HAWAII FEDERAL ASBESTOS CASES                        )        Civil No. CV04 00661 REJ BMK
                                                     )
                                                     )
MERCY S. BYINGTON, individually and as               )        OPINION AND ORDER
Personal Representative of the Estate of JIMMY F.    )
BYINGTON, deceased, EVELINE SHORT, and               )
BEVERLY ANN HAUOLI ANI, as Prochein Ami              )
for MARGARET BARBARA HA'EHA'E ANI,                   )
a minor,                                             )
                                                     )
                        Plaintiffs,                  )
                                                     )
                v.                                   )
                                                     )
UNITED STATES OF AMERICA,                            )
                                                     )
                        Defendant.                   )

JONES, Judge:

        Plaintiffs filed this action against the United States pursuant to the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, to recover money damages for the alleged

wrongful death of Jimmy Byington ("Byington") on June 27, 2002.  Plaintiffs allege that

Byington was exposed to asbestos in "Buildings 3400B, 3427, 3426, 3415 and others" at Hickam Air Force Base, Hawaii, from approximately 1989 to 1993.[1]

Defendant United States has moved to dismiss plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), or in the alternative for summary judgment pursuant to Fed. R. Civ. P. 56 (dkt. # 20). Defendant asserts that plaintiffs' claims are jurisdictionally barred by the applicability of the discretionary function exception to the limited waiver of sovereign immunity provided under the FTCA, 28 U.S.C. § 2680(a).

For the reasons explained below, I grant defendant's motion for summary judgment and deny as moot the motion to dismiss.

## STANDARDS

1.    Rule 12(b)(1) Motion to Dismiss

Defendant's challenge to this court's subject matter jurisdiction is a proper subject for decision under a Rule 12(b)(1) motion to dismiss. Because subject matter jurisdiction is a threshold issue, it must be decided at the outset, rather than deferred until trial. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998).

In ruling on a Rule 12(b)(1) "speaking" motion to dismiss, i.e., one in which the parties submit extrinsic evidence outside the complaint, no presumptive truthfulness attaches to the plaintiff's allegations. Instead, because plaintiff always bears the burden of establishing subject matter jurisdiction, in effect the court presumes lack of jurisdiction until the plaintiff proves

---

[1]        Plaintiffs have also alleged that Byington was exposed to asbestos at various times and locations throughout his life, including exposure in the course of his lifelong hobby of working on asbestos-containing automobile brakes and engine gaskets. The latter exposure is the basis for litigation plaintiffs commenced in state court against numerous private defendants. The status of that litigation is not part of the record before this court.

2 - OPINION AND ORDER

otherwise. <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377 (1994); <u>Stock West, Inc. v. Confederated Tribes of the Colville Reservation</u>, 873 F.2d 1221, 1225 (9th Cir. 1989).

2.     <u>Rule 56 Motion for Summary Judgment</u>

Defendant brings an alternative motion for summary judgment.  Under Rule 56, summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact.  <u>United Steelworkers of America v. Phelps Dodge</u>, 865 F.2d 1539, 1542 (9th Cir. 1989).

The substantive law governing a claim determines whether a fact is material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>T.W. Elec. Service v. Pacific Elec. Contractors</u>, 809 F.2d 626, 630 (9th Cir. 1987).  Reasonable doubts as to the existence of a material factual issue are resolved against the moving party.  <u>T.W. Elec. Service</u>, 809 F.2d at 631.  Inferences drawn from facts are viewed in the light most favorable to the non-moving party.  <u>Id</u>. at 630-31.

Under either standard, plaintiffs bear the <u>initial</u> burden of persuading the court that it has subject matter jurisdiction under the FTCA's general waiver of immunity.  <u>Prescott v. United States</u>, 973 F.2d 696, 701 (9th Cir. 1992).  In the Ninth Circuit, the United States bears the "<u>ultimate</u> burden" of proving the discretionary function exception to the FTCA's waiver of

sovereign immunity.  Prescott, 973 F.2d at 701 (adopting approach of Sixth and Seventh Circuits

(emphasis added)); see also Valdez v. U.S., 56 F.3d 1177, 1179 (9th Cir. 1995).

 The requirements for establishing the discretionary function exception are discussed

below.

UNDISPUTED BACKGROUND FACTS

 The following background facts are undisputed.

 Hickam Air Force Base ("Hickam AFB") is a federal facility owned by the Department of

Defense.  During the time frame alleged in plaintiffs' complaint, November 6, 1989 to 1993,

Byington was employed by the state of Hawaii as a laborer for the Hawaii Air National Guard

("HIANG), at the Hickam Air National Guard ("Hickam ANG") base, which is located on part of

the Hickam AFB.

 Byington's alleged exposure to asbestos at Hickam AFB occurred, if at all, in buildings

3400B, 3427, 3416, 3426, and 3415.  Defendant (through the U.S. Air Force) licensed these

buildings to the HIANG at all times relevant to plaintiffs' claims.  The licensing agreement was

based on statutory and regulatory authority set forth in 32 U.S.C. § 503 and Air Force

regulations, AFI 32-9003 and Air Force Regulation 87-3.  The initial licensing agreement

between the Air Force and the HIANG for use of Hickam AFB facilities was executed in

November 1975 and continues in effect today, as modified by various supplemental agreements.

 The state of Hawaii and the HIANG assumed the responsibilities as set forth in the 1975

licensing agreement.  The HIANG developed and implemented an asbestos management

program that covered the buildings at Hickam AFB licensed to the HIANG.  The asbestos

management program was prepared by the Air National Guard Civil Engineering Technical

4 - OPINION AND ORDER

Services Center, Minot, North Dakota, and issued in early 1992.  The program expressly identifies and applies to all of the buildings plaintiffs allege contain asbestos.

The parties further agree that the "overall objective of the asbestos management program is to ensure that the health and welfare of all base personnel are protected from the potentially harmful effects of asbestos containing material," and that the HIANG monitored and tested the air in the buildings where Byington worked.

Plaintiffs also agree in part to some of defendant's statements, as follows.  Plaintiffs agree that before 1992, there was no requirement that the HIANG have a formal program to address asbestos.  Plaintiffs agree that the HIANG provided notice to state employees of the presence of asbestos, and admit that of all of the raw asbestos air tests taken, none of the test  results ever exceeded or came close to exceeding federal or state maximum contaminant levels.

The specific facts relevant to the discretionary function exception are set forth below.

## LEGAL STANDARDS UNDER THE FTCA

1.    <u>The FTCA</u>

The FTCA is a limited waiver of sovereign immunity and provides the exclusive avenue for money damage suits against the United States for non-marine torts.  28 U.S.C. §§ 2674, 2679(b)(1).  Consent to suit by the United States cannot be implied, but must be unequivocally expressed and strictly construed.  <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30, 34-35 (1992).  Because the United States "can be sued only to the extent that it has waived its immunity, due regard must be given to the [FTCA's] exceptions."  <u>United States v. Orleans</u>, 425 U.S. 807, 814 (1976).  Waivers of sovereign immunity are thus strictly construed, <u>United States</u>

v. Trident Seafoods Corp., 92 F.3d 855, 864 (9th Cir. 1996), and "the court must construe any ambiguities in favor of immunity." United States v. Williams, 514 U.S. 527, 531 (1995).

2.    The Discretionary Function Exception to the FTCA Waiver of Sovereign Immunity

The discretionary function exception to the FTCA precludes liability for claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); see also Valdez, supra, 56 F.3d at 1179. The discretionary function exception "serves to 'insulate[] the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.'" O'Toole v. United States, 295 F.3d 1029, 1033 (9th Cir. 2002)(quoting Berkovitz v. United States, 486 U.S. 531, 537 (1988)). The exception "reflects Congress's 'wish[] to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" Id. (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984)). In other words, "'if judicial review would encroach upon th[e] type of balancing done by an agency, then the [discretionary function] exception' applies." O'Toole, 295 F.3d at 1033 (citation omitted; brackets in original).

Thus, as the statute expressly provides, so long as the federal agency or employee was performing a "discretionary function," the exception applies, "even if the discretion was abused." National Union Fire Ins. v. U.S., 115 F.3d 1415, 1418 (9th Cir. 1997). In keeping with U.S. Supreme Court jurisprudence, the Ninth Circuit applies a two-step analysis to determine

applicability of the discretionary function exception.  O'Toole, 295 F.3d at 1033 (citing United States v. Gaubert, 499 U.S. 315, 324-25 (1991), and Berkovitz, supra, 486 U.S. at 536-38).

Looking to "'the nature of the conduct, rather than the status of the actor,'" the court assesses the conduct in two ways.  Conrad v. United States, 447 F.3d 760, 764 (9th Cir. 2006)(quoting Berkovitz, 486 U.S. at 536).  First, the court considers whether the action at issue involves the exercise of judgment or choice by the agency.  O'Toole, 295 F.3d at 1033.  The discretionary function exception will not apply if "there exists a statute, regulation, or policy mandating particular conduct by a government employee and the statute, regulation, or policy does not allow for the exercise of discretion in fulfilling that mandate."  Conrad, 447 F.3d at 765.  The reason the exception does not apply in such a case is that "the government employee will have no choice but to follow the mandatory directive."  Id.

If the agency's course of conduct is not mandated by statute or regulation, an FTCA plaintiff still can prevail under the second part of the analysis, which asks whether the government actions at issue "are of the nature and quality that Congress intended to shield from tort liability."  O'Toole, 295 F.3d at 1033.  "Government actions involving the exercise of judgment or choice are exempted from suit under the FTCA only if the are 'susceptible to policy analysis,' * * * and involve a 'decision[] grounded in social, economic, and political policy.'"  Id. at 1033-34 (citations omitted).   The proper level of inquiry is act by act:  "The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance.  Each separate action must be examined to determine whether the specific actor had discretion of the type Congress intended to shield."  In re Glacier Bay United Cook Inlet Drift Assoc., 71 F.3d 1447, 1451 (9th Cir. 1995).  Negligence,

in and of itself, is insufficient and irrelevant if the actions at issue are rooted in policy.  In re Glacier Bay, 71 F.3d at 1451.

THE PARTIES' ARGUMENTS

1.    Summary of the Parties' Arguments

The following is a brief summary of the parties' basic arguments, which are discussed in detail later in this opinion.

In its opening brief, defendant focuses its argument on its relationship with the HIANG. Defendant contends that plaintiffs' allegations of federal negligence[2] fail because any duty to address asbestos in plaintiffs' workplace or to provide a safe workplace rested with the state of Hawaii and the HIANG, not defendant.  As defendant poses it, the "sole issue with respect to the first prong of the analysis is whether the United States had discretion to license the facilities to the HIANG, leaving responsibility for safe building maintenance with the HIANG."  In support, defendant relies on the regulations in place at the relevant time, which allowed the government to license the facilities and leave responsibility for safe building maintenance to the HIANG.

In response, plaintiffs turn the argument from whether defendant had the discretion to license the facilities to the HIANG to whether defendant violated Air Force Regulations that, according to plaintiffs, mandated that defendant remove or repair all damaged friable asbestos. Although plaintiffs do not dispute that defendant had the discretion to delegate responsibility to the HIANG, plaintiffs contend that defendant did not assign total responsibility to the HIANG,

_____

[2]    Plaintiffs allege that the defendant "'carelessly and negligently permitted dangerous and defective asbestos products to exist at [Hickam AFB]; and * * * [d]efendant negligently failed to provide [decedent] a safe place of employment by reason of its acts, omissions and conduct.'"  Defendant's Memorandum, p. 13 (quoting Complaint, ¶ 8).

8 - OPINION AND ORDER

rather, defendant maintained control over and responsibility for what was deemed to be an asbestos hazard.

In reply, defendant contends that the Air Force Regulations are not mandatory, and re-asserts the argument that it made a policy-based decision to delegate asbestos management and worker safety to the HIANG.

2.    Evidence Relevant to the Parties' Arguments

The following evidence, drawn from the parties' submissions, is relevant to the arguments.

a.    Defendant's license agreement with the state of Hawaii and the HIANG

The parties agree that defendant had express statutory and regulatory authority to license facilities at Hickam AFB to the state of Hawaii for use by the HIANG.

The initial license agreement was executed in November 1975 and continues in effect today, as modified by various supplemental agreements. As pertinent to the present issues, the license agreement provides:

> 2.    [T]he licensee shall maintain and keep in good repair and condition the premises * * * and all costs of operation, maintenance, and restoration occasioned by reason of the occupancy of the premises by the licensee shall be paid for from funds available to the licensee, or from funds other than those appropriated for the Regular Establishment of the [Department of the Air Force].
>
> * * *
>
> 4.    [T]he Government will not be responsible for any injury to persons or damage to property arising out of or incident to the use or occupancy of the licensed property by the licensee, howsoever such injury or damage may be caused, and the licensee shall indemnify and save the Government harmless from any and all claims for any such injury or damage, excepting claims for injury or damage arising from activities of the Government on the said property which are being conducted exclusively for the benefit of the Government. * * *.

9 - OPINION AND ORDER

Having established the state's obligations, the agreement then goes on to provide that:

> 6.    [N]o addition to or alteration or improvement of the premises shall
> be made without prior written authorization from the Secretary of the Air force or
> his duly authorized representative.  * * *.

Defendant's Concise Statement, Exhibit B.   According to Lei Lum, the Real Property Officer for

the Air Force at Hickam AFB, "[t]he HIANG, which had its own asbestos management program,

was responsible for managing the asbestos that was in the licensed buildings and [was

responsible] for the health and safety of the state employees who worked in the buildings."

Declaration of Ms. Lei A. Lum, Exhibit D to Defendant's Concise Statement, p. 2, ¶ 6.

    b.    <u>Management of Asbestos at the Hickam AFB Licensed Premises</u>

As stated earlier, Byington worked at Hickam AFB from 1989 through 1993; thus, the

relevant time frame ends in 1993.

In 1988, defendant issued Air Force Regulation 91-42, titled "Real Property Operation

and Maintenance -- AIR FORCE FACILITY ASBESTOS MANAGEMENT."  Plaintiffs'

Concise Statement, Exhibit A.  The preamble to the regulation states that:

> This regulation <u>outlines procedures</u> for developing a base facility asbestos
> management program.  It also <u>contains optional guidance</u> to help the base civil
> engineer (BCE) develop and administer plans to incorporate facility asbestos
> management procedures and practices into * * * Operations and Maintenance
> (O&M) projects.  <u>It applies to all organizations and members that have civil
> engineering responsibilities</u>, including the Air Force Reserve and <u>Air National
> Guard.</u>

(Emphasis added.)  The "Policy Guidance," Section A, provides that asbestos-containing

materials ("ACM") that remained after defendant strictly limited asbestos use "must not be

allowed to deteriorate, become damaged or be disturbed by workers or occupants unless

10 - OPINION AND ORDER

precautions have been taken to prevent exposure to airborne asbestos fibers." <u>Id</u>. To reduce the possibility of exposure,

> bases must develop and implement asbestos management programs. This regulation sets basic requirements for establishing and maintaining these programs. Attachment 1 contains optional guidance to assist the BCE in developing and implementing the program.

The Policy Guidelines contain the following provisions key to the issues presented:

> a.    **Asbestos Repair.** Asbestos materials in Air force facilities do not pose an inherent hazard. The are only hazardous in conjunction with a mechanism or event that could cause the material to breakup into individual fibers and become dispersed into the breathing environment. However, there is a presumption that all damaged ACM is hazardous because of its potential to release airborne asbestos fibers. As a result, all presumptive asbestos hazards must be eliminated either by repairing or removing damaged ACM.

> b.    **Asbestos Removal:**

> (1) Asbestos must be removed when it poses a threat to release airborne asbestos fibers and it can't be reliably repaired or isolated. Such "must remove" mandates must be given by the bioenvironmental engineer based on a direct evaluation of the facility. * * *

> (2) When there is no compelling mandate to remove asbestos, decisions to remove rather than repair damaged friable asbestos materials should be based on degree of risk to facility occupants, use of facility, feasibility of repair, frequency of repair and cost-effectiveness.

> * * *

> c.    **Facility Management:**

> (1) Closely monitor facilities to make sure ACM does not become airborne.

> (2) Promptly assess visibly damaged building materials in facilities to determine if they contain friable asbestos material. If so, the material must be expediently repaired by qualified personnel.

11 - OPINION AND ORDER

(3)  Assess sprayed-on, troweled and easily damaged building materials to determine if they contain friable asbestos materials.  Routinely inspect friable ACM and make sure it is kept in good condition.

d.    **ACM Policy Implementation.**  Each installation having maintenance responsibility must develop a written management plan and operating plan to carry out the policy objectives of facility asbestos management.

Exhibit A.  The regulations also assign responsibilities for the various tasks described.  As

pertinent, the Air Force was to "[f]ormulate[] policies and guidance necessary for bases to

develop and maintain a viable facility asbestos management program."  The base civil engineer

("BCE") was responsible to (1) appoint an asbestos program officer; (2) develop a base asbestos

management plan; (3) develop and implement a comprehensive written asbestos operating plan;

and most significantly,

(4)    With the base bioenvironmental engineer, examine[] friable ACM and make[] professional judgments concerning whether repair, maintenance, or removal of the material is required; whether extraordinary precautions, such a frequent monitoring, removal of personnel from the area, temporary controls, or other protective measures are required to protect personnel until recommended actions are completed.

See generally Plaintiffs' Concise Statement, Exhibit A.

The parties agree that before 1992, there was no requirement that the HIANG have a

formal program to address asbestos.  According to the Declaration of Colonel Michael Compton

("Compton Decl.") of the HIANG, in January 1992, while he was serving as the HIANG

Environmental Coordinator, he participated in the asbestos survey of the buildings at Hickam

AFB.  Compton was appointed by the Base Environmental Coordinator as the Asbestos Program

Officer, responsible for maintaining the asbestos management plan at the HIANG and handling

asbestos related issues.  Compton Decl., Exhibit F to Defendant's Concise Statement.

The HIANG Asbestos Management Program, Exhibit E to Defendant's Concise

Statement, was then implemented in 1992.  According to Compton, even though before 1992

there was no requirement that the HIANG have an asbestos program, the HIANG nonetheless

actively monitored and tested its facilities for asbestos.  Compton Decl., ¶ 5.  Compton further

states:

> 5.  * * * As stated in the [HIANG] Asbestos Management Plan, the HIANG was
> responsible for state worker health and safety while working in the HIANG
> facilities.  In addition, the HIANG provided notice to state workers about the
> presence of asbestos in the HIANG facilities and provided them training on
> asbestos safety.
>
> * * *
>
> 7.  As part of the HIANG Asbestos Management Program, the HIANG monitored
> the air within the buildings to ensure that any asbestos detected did not exceed
> federal or state contaminant levels.  Of all of the samples taken, I am not aware of
> any that ever exceeded, or even came close to exceeding, federal or state
> maximum contaminant levels.
>
> 8.  Of the buildings identified in the Byington complaint, the hangar building,
> B-3400, was one that contained asbestos on the ceiling girders, which had been
> sprayed on as a fire retardant.  To the best of my knowledge, this fire retardant
> was placed on the girders in the 1960s, and was never friable during the time that
> Mr. Byington worked in the hangar.
>
> 9.  On at least two occasions, the HIANG sent requests to the National Guard
> Bureau in Washington, D.C., seeking funding for a major asbestos remediation
> project for B-3400.  Funding was not provided based on the fact that repeated
> asbestos testing in the HIANG did not disclose any level of asbestos in excess of
> state or federal maximum levels or action levels.

Compton Decl., Exhibit F to Defendant's Concise Statement, ¶¶ 5, 7-9 (emphasis added).

Turning to the Asbestos Management Plan itself, the plan was developed pursuant to Air

Force Regulation 91-42, discussed above, after completion of the asbestos survey in January

1992.  The plan consists of two components, an asbestos management plan ("AMP"), and an

asbestos operating plan ("AOP").  <u>See</u> Defendant's Concise Statement, Exhibit E.  Under

paragraph 1.2, "<u>Objectives</u>," the document states that the "overall objective" is to "ensure that the

health and welfare of all base personnel are protected from the potentially harmful effects of

asbestos containing material."  Exhibit E, p. 1.  To this end, however, "<u>Air Guard policy is to</u>

<u>manage ACM in place</u> as long as practicable; ideally until a facility with ACM is scheduled for

disposal":

> This requires that installations have  specific procedures for managing facilities
> with ACM and protecting personnel from the hazards associated with airborne
> fibers from damaged ACM.  It is the intention of the Air Guard to remove ACM
> whenever it is opportune to do so, whenever it is a potential threat to personnel
> health, and as necessary to comply with applicable regulations.

Exhibit E, p. 2 (emphasis added).

Paragraph 2.4 of the plan provides for monitoring and surveillance, stating that "[a]ll

locations with friable ACM will be monitored on an on-going basis to ensure that the ACM does

not become damaged or deteriorate and pose a risk of exposure to base personnel."  This was to

be done on a semi-annual basis to check the condition of the ACM and identify damage and

deterioration.  Exhibit E, p. 29.

    c.    <u>History of Asbestos Monitoring and Management</u>

The history of asbestos monitoring and management may be gleaned from a series of

letters and memorandums dated between 1981 and 1993, the latter being the year Byington

ceased working at the HIANG.  Plaintiffs submit additional documentation pertaining to later

dates, but fail to explain its relevance to the issues presented.  Consequently, with limited

exceptions, I do not consider the post-1993 documentation in this decision.

Years before development and implementation of Air Force Regulation 91-42 and the HIANG Asbestos Management Program, defendant had conducted asbestos sampling at Hickam AFB.  By 1981, Hangar 3400 had been identified as having "crysotile [sic] asbestos insulation material on most of the elevated beams throughout the inner structure."  Plaintiffs' Concise Statement, Exhibit C, (document USAFO1-00284).[3]   In November 1981, three samples of debris were collected and sent for analysis, along with a breathing air sample.  The results showed the presence of 0 to 4 percent chrysotile asbestos in the debris and "less than the practicable detectable limit of 0.01 fibers/cc present in the worker's breathing zone."  Exhibit C, p. 284.  As a result, Major Marlin Sweigart of the USAF advised the HIANG that "no additional actions are required by you other than a continued observance of the condition of the insulation material," and further advised that "[i]f deterioration of the asbestos increases, serious consideration should be given to removing the material or to encapsulating it to prevent fiber release.  I don't feel natural deterioration will ever cause fiber levels in this hangar to exceed the Permissible Exposure Limits (PELS) where this action would be mandatory, however you may want to consider these alternatives to alleviate worker concern and eliminate the problem completely."  Exhibit C, pp. 284-85.

In December 1982, Captain Matsuda of the HIANG wrote a memorandum enclosing numerous documents on the subject of "Encapsulation/Removal of Insulation for Aircraft Hangar, Bldg 3400, Hawaii Air National Guard, Hickam AFB, Hawaii."  Exhibit C, p. 487.  Among other things, the memorandum states the following:

---

[3]       Plaintiffs' Exhibit C contains a number of pages, which I identify by the USAF01 Bates Stamp numbers in the lower right corners - e.g., 284.

2.      * * * Since 1978, pieces of insulation have been falling resulting in a possible asbestos exposure problem to personnel working in the hangar.  Careful study of the deterioration revealed three areas of concern all of which are being watched closely:

    a.      Air Flow.

    b.      Birds nesting in structural frame.

    c.      Leaking hangar roof (Maintain roof project completed in FY 81).

3.      The problem is being tracked by the Hickam AFB Bio-Environmental Engineer and the 154 COMPG/SEE.  Their results are inclosed.  No hazard exists at this time; however, the potential is high and future accelerated deterioration is a certainty.

4.      Present action consists of tracking of insulation "fallout" by the hangar deck chiefs and the group safety officer.  The BEE will not assign a risk assessment code (RAC) to the hangar because of the air sampling results. However, a plan for future corrective action must be implemented; now, to prevent undue delay when action is taken.

5.      This problem has been discussed with numerous individuals who are involved in asbestos removal/encapsulation. * * * The following considerations were discussed:

    a.      Asbestos removal could create a greater asbestos hazard due to the difficulty in removing all material -- a definite airborne asbestos problem.

    b.      Asbestos removal would destroy the fire rating of the structure.

    c.      Asbestos removal would create a tremendous corrosion control problem since the structure is located 100 yards from the ocean with prevailing winds off the water.

    d.      It would take approximately four weeks to encapsulate the 25,500 SF hangar using a product such as "Asbestite 3000."

    e.      Encapsulation would not add appreciable weight to the structure.

    f.      Fire rating the structure and corrosion control would not be a problem with encapsulation.

16 - OPINION AND ORDER

g.    Encapsulation with "asbestite" * * * would bind the asbestos fibers * * * and possible render them harmless * * * if the material were to fall from the hangar roof.

Exhibit C, p. 487-88 (emphasis in original).

In January 1983, Thomas Webb, Chief, Bioenvironmental Engineering Services of the USAF, responded. Webb stated that based on the correspondence from the HIANG, "[i]t is appar[ent] that there is no immediate health hazard due to asbestos in Bldg 3400. However, our opinion is that the hazard risk can only increase; therefore planning for reducing or el[i]minating the problem should begin now." Exhibit C, p. 283. Webb then recommends:

a study be made to determine if encapsulation is an option at this point. If it is, a project for the near future (FY 84-85) should be initiated. If it is not, we would recommend continued monitoring by the Hickam Bioenvironmental Engineer until the airborne asbestos level reaches one-half the permissible exposure limit as defined in the most current AFOSH Standard 161-4 paragraph C.1.A; at this point a project for complete removal should be initiated.

Id.

At this point, the parties' submissions skip ahead to 1986. A Memorandum For Record dated September 4, 1986, summarizes a meeting between HIANG and USAF representatives held to discuss "Hangar Asbestos, HANG Project 86-004; Remove/Encapsulate hangar Insulation, Bldg 3400, 154 COMPG." See Exhibit C, p. 453-54. Among other things, the memorandum states the following:

●    We had numerous air samplings of the Hangar area both with open and closed doors. No detectable airborne concentration of asbestos results were measured.

●    [B]ulk samples * * * confirmed the presence of Chrysotile asbestos in the spray-on material. Material is in a friable condition and any mechanical agitation would release the fibers into the air. Due to climatic conditions in Hawaii, the Hangar doors are normally in the open position. The combination of tradewinds, birds nesting in the structural beams, and spot roof leaks have resulted in patches of the substance falling to the floor periodically.

17 - OPINION AND ORDER

- Major Martinez-Perez [USAF] mentioned that the EPA is really hot and heavy on asbestos problems and is emphasizing the total elimination of use of asbestos as insulating material. He mentioned that the air sampling should not be used as a gauge for treatment. The material is potentially hazardous in its present state and action must be taken to eliminate the hazard.

Exhibit C, p. 453. The memorandum mentions two alternatives, removal or encapsulation to be followed with removal. The memorandum then concludes that "[t]he major concern is the HANG, F-15 conversion which begins - FY 87 (2nd quarter). Any closure of the Hangar during this period would impact our conversion. We need to act now." Exhibit C, p. 454.

In October 1987, after reviewing the specifications for the encapsulation project (estimated cost, $500 K) for Building 3400, Martinez-Perez of the USAF wrote the following comments, among others, to the HIANG BCE:

> Even though chemical encapsulation is considered a viable mean[s] to prevent asbestos fibers from becoming airborne, asbestos experts caution that a pilot test of the encapsulant and the material be done before embarking in expensive extended projects. The reason they express concern is the great potential for material delamination with the added weight of the encap[sulant]. In Bldg 3400, we should be really concerned due to the present condition of the existing material which is known to be delaminating through age and weather action. Our office still believes that the present encapsulation project will only provide a temporary fix. Since the asbestos material will probably have to be removed at a later date, the cost will probably quadruple.

Exhibit C, p. 279. Another document, Exhibit C, p. 334, appears to be a paragraph by paragraph review and comment form for the Hangar 3400 project. With respect to "Project Phasing," the comments are as follows:

> Authorization to proceed with the next design phase (pre-final) is withheld and pending the receipt and analysis of the following information:
>
> LTC Roberto Martinez-Perez has raised the underlying concern of this entire project by his comment 1a in his letter of 22 Oct 87. Request the AE review his

comments and respond directly to the BCE and USFCFO[4] with a copy to this office. It is further recommended that the A-E obtain the written guarantee of the factory representative on the life and effectiveness of his product on this hangar. The manufacturer may also provide some certification to those applying this product and guarantee its effectiveness for 10 or 15 years. Report the findings and determinations to ANGSC/DEP &DEM immediately. The main concern is that ANG will <u>needlessly</u> spend $500.0 K for this project and the encapsulation method will fail without the government having a legitimate legal recourse. The A-E provided an example of its effectiveness at West Point. However, we need to know what guarantee will be provided to the government under the contract.

Exhibit C, p. 334 (emphasis in original). In a memorandum dated February 2, 1988, the Chief of the Operations & Maintenance Branch of the National Guard Bureau, Robert Rhoads, disapproved the Bldg 3400 project, stating that the project was "not approved and the preliminary design submittal must be resubmitted subject to incorporation of review comments being forwarded directly to the Base Civil Engineer and the US Property and Fiscal Officer." Exhibit C, p. 333. A hand written note at the bottom of the page by an unidentified author, dated March 10, 1988, notes that at "the meeting," "We recommended removal and replacement of the material! But we told them that they would have to make [a] decision on how they wanted to spend the money. I told them that the contractor would not guarantee the material for any significant amount of time and that pilot testing would be necessary if encapsulation was chosen * * *."[5] <u>Id</u>.

Also on March 10, 1988, Martinez-Perez wrote concerning an asbestos survey in the air handler room 21A in another building, Bldg 3382, as well as the air handler room 31A in Bldg 3400 and the hallways in front of those rooms. The samples indicated the presence of 25

---

[4]     This may not be accurate, as the letters are partly illegible.

[5]     At this point, the note runs off the bottom of the page.

percent chrysotile asbestos, but, according to Martinez-Perez, "presents no health hazard in room 31A and the connected hallway duct system.  However, the air conditioning duct located in the hallway adjacent to room 21A is in poor condition and friable asbestos is visible."  Martinez-Perez concludes that "[t]he air conditioning duct insulation must be repaired in the hallway of 21A."  Exhibit C, p. 329.

On July 11, 1988, the USAF Deputy Chief of Bioenvironmental Engineering Services, Brian Blazicko, wrote a summary of comments on review of the Bldg 3400 project.  Among other things, Blazicko notes that the encapsulation contractors were willing to guarantee only two years, and that "[f]rom an economical point of view, the cost of encapsulation does not seem to be justified, since there are several physical factors at the hangar which are causing the present asbestos to deteriorate," including tradewinds causing the material to flex, salt air, building vibrations caused by engine run-ups.  Blazicko suggests that the encapsulation "should have a broader guarantee: e.g., 10 to 20 years, in order to preclude asbestos abatement."  Exhibit C, p. 322.

In a letter dated April 10, 1990, Alvin Satogata, the HIANG BCE, wrote that "[t]he [HIANG] is currently redesigning its asbestos abatement project within the hangar portion of Bldg 3400.  * * * The hangar is normally open, with flow-through ventilation, and is closed during inclement weather.  Air sampling has to date recorded acceptable airborne fiber levels."  Satogata then requests "an asbestos hazard assessment be conducted to determine the necessity of this asbestos abatement project.  The abatement measure under consideration by the HIANG is removal of the ACM within the hangar.  The assessment is required to justify the cost of the

work." Exhibit C, p. 276. Typed on the bottom of the letter and dated April 30, 1990, is the

following note, signed by Stephen Payne, USAF Chief, Bioenvironmental Engineering Services:

> In its current state I do not consider the subject ACM to be "friable."
> Also, as you indicate in your letter, past air sampling has not indicated any
> hazardous levels of asbestos fibers in the building air. Therefore, I do not feel
> removal is necessary. I recommend the material be indefinitely managed in place.

Id.

On July 27, 1990, the HIANG BCE Satogata responded:

> 2.      Before the HIANG cancels our asbestos abatement project * * *
> altogether, we would like to insure that your office is aware of the history of this
> project. In the past, abatement was recommended by your office because it was
> believed that the deterioration of the fire retardant would increase with time and
> eventually pose a problem. Removal was preferred due to questions regarding the
> reliability of an encapsulant. Then, as now, there was no immediate health hazard
> from airborne asbestos.

> 3.      Request your reevaluation of the hazard in terms of long term release
> potential. It is our disposition that if there is a significant probability that the
> health hazard will increase in the future, we should conduct the removal process
> now to preempt any safety threats and cost escalations.

Exhibit C, p. 274.

That letter appears to have resulted in a meeting on August 8, 1990, involving (at least)

Major Payne of the USAF and Jonathan Ito, the HIANG Environmental Engineer. A

Memorandum of Record, which memorialized the meeting, reflects that

> a.      * * * Major Payne was asked to clarify his recommendation to manage in
> place the asbestos in Bldg 3400 in light of the recommendations that had come
> out of the 15 ABW/SGPB office in the past. Major Payne responded that because
> the material does not pose a significant hazard at present, or in the foreseeable
> future, health concerns can not be used as justification for the encapsulation or
> complete removal of the hanger asbestos insulation. He has consulted with others
> knowledgeable about asbestos and they have given the same recommendations.
> The only reasons he can see as justification of the complete encapsulation or
> removal of the hanger insulation are first, peace of mind, where we would remove
> the asbestos in order to eliminate the possibility of any problems in the future, or

21 - OPINION AND ORDER

second, if we had funds specifically for this type of work that required expenditure.

b.        * * * The method of abatement all depends on how old the insulation is and if it is still in good condition.  He feels that it is in good condition.  It is not friable, in that although you could break it up by hand the insulation itself is rather hard.  Major Payne said that in his opinion, the material will continue to be in good condition for the next five years.  If we're concerned about some old water damaged areas, he recommends encapsulation of those small damaged areas associated with leaks that occurred prior to the hanger roof repair.

c.        Frequency of Air Sampling.  There is currently no set frequency for air sampling.  Due to the new AF Regulation 91-42, CE is now in charge of the entire Air Force Asbestos Program.  BEE is involved in a consultation role, on friable asbestos.  We would go through CE for bulk sampling.  CE should schedule inspections of all suspected ACM.  If an area is discovered that CE becomes concerned about, CE can request air monitoring from BEE.  Justification for the request must be given.  If no hazard is found, then the frequency of monitoring will be reduced.  Major Payne said that at the most, our areas could be sampled every 6 months, but he doesn't think they require monitoring more frequently than annually.

d.        15 ABW/SGPB Assessment of Health Hazard and Recommendations.  Complete removal would disturb the asbestos, and there would always be residual asbestos in the crevices since we're dealing with a surface that is not smooth.  15 ABW/SGPB recommends management in place.  This would involve scheduled inspections, spot encapsulation when required, and spot removal when appropriate.  Should the material begin to deteriorate rapidly in the future, then we could consider more drastic measures, but given his knowledge of the history of the material and its present condition, these are his recommendations.

Exhibit C, pp. 272-73.

On May 28, 1991, a chemist's routine test of a sample of ceiling surface material from

Bldg 3400, done at the request of the USAF Asbestos Program Manager, revealed 15 percent

chrysotile asbestos.  Exhibit C, p. 265.  The historical asbestos ambient air sample results never,

from June 1981 through August 1997, approached the occupational limit of airborne

concentration in excess of .1 f/cc of air during an 8-hour work day.  In fact, the level never rose

above .01 f/cc, and most often was significantly lower (less than .002 f/cc).  Exhibit C, pp. 222-23.[6]

DISCUSSION

1.    <u>Did Defendant Have Discretion to Licence Premises to Hawaii for Use by the HIANG</u>?

Defendant's primary argument focuses in substantial part on whether it had discretion to enter into the licence agreement with Hawaii for use of portions of Hickam AFB by the HIANG, and to delegate responsibility for asbestos management and worker safety to the HIANG.  There is no dispute that defendant had the discretion to do this, nor is there any valid dispute that the choices made with respect to licensing and delegation of responsibilities are policy choices subject to the discretionary function exception.  Indeed, plaintiffs do not contend that defendant is liable under the FTCA for licensing the buildings to the HIANG or delegating asbestos management and worker safety to the HIANG.  Instead, plaintiffs contend that defendant retained a certain level of control over asbestos management -- specifically, control over what was deemed to be an asbestos hazard -- and, according to plaintiffs, violated mandatory provisions in not taking action to encapsulate, remove, or otherwise contain the asbestos containing materials present on the premises.

That defendant delegated and the HIANG assumed responsibility for asbestos management and worker safety is confirmed by Colonel Michael Compton, who, as mentioned,

_____

[6]    Byington ceased working for the HIANG in 1993.  By 2001, the records reflect that "[a]lthough historical records indicate the ACM was previously in good condition and not deteriorating, the ACM is now flaking to the hangar floor and the adhesive is failing."  Even then, the bioenvironmental engineer was recommending that the ACM be managed in place with encapsulation or abated.  By that time, a new Air Force Regulation, 32-1052 (effective March 22, 1994), addressed facility asbestos management.  <u>See</u> Exhibit C, pp. 207-08.

23 - OPINION AND ORDER

served as the HIANG Environmental Coordinator beginning in 1992 and was responsible for maintaining the asbestos management plan at Hickam ANG and handling asbestos related issues. According to Compton, the HIANG was responsible for state worker health and safety while working in the HIANG facilities.

Although defendant may have retained some responsibility for asbestos management in the leased premises under the relevant Air Force Regulation, the evidence demonstrates that the responsibility was limited to making recommendations and suggestions, which the HIANG was free to adopt or disregard. This is reflected in the role reserved to defendant in AFR 91-42, which was limited to formulating "policies and guidance necessary for bases to develop and maintain a viable facility asbestos management plan" and undertaking "management and technical initiatives to help * * * implement facility asbestos management." AFR 91-42, Section A.3.a. Defendant's limited role also is reflected in the correspondence, quoted supra, in which the USAF's comments repeatedly are couched in terms of recommendations and suggestions, not requirements or mandates.

At oral argument, defendant urged that this case is a delegation case, not a discretionary function case per se, and I agree with defendant in that regard. Having reviewed all the evidence and considering the parties' arguments, I am persuaded that to the extent defendant retained control under the lease over alterations or improvements to the premises, that lease provision does not apply to asbestos management, maintenance, and repair, which is the subject matter of this action.

Nonetheless, although in my view, defendant's discretionary delegation to HIANG is dispositive, defendant had some responsibility for asbestos management under the relevant Air

Force Regulation.  Consequently, my analysis would not be complete without a consideration of the regulations and their effect on the relationship and relative responsibilities of defendant and the HIANG.

2.  Did Defendant Violate Mandatory Air Force Regulations in Handling Asbestos Issues at Hickam AFB?

Plaintiffs contend that Air Force Regulation ("AFR") 91-42 mandated repair or removal of asbestos at Hickam AFB, and that defendant had no discretion to take no action to do either.

As a preliminary matter, I note that AFR 91-42, entitled "Air Force Facility Asbestos Management," outlines procedures for development of base facility asbestos management plans by whoever is in charge of the facilities, be it the federal government or a lessee such as the HIANG.  The regulation does not purport to establish a management plan, rather, it merely sets out the parameters for such a plan.

In any event, plaintiffs find the alleged "mandatory" language directing *defendant* to remove or repair asbestos at Hickam AFB in the following portion of AFR 91-42:

> [T]here is a presumption that all damaged ACM is hazardous because of its potential to release airborne asbestos fibers.  As a result, all presumptive asbestos hazards must be eliminated either by repairing or removing damaged ACM.

Plaintiffs' Concise Statement, Exhibit A.  Plaintiffs' argument ignores the context of that general language, which is contained in a section titled "Policy Guidelines" and is followed with more precise guidelines.  ACM "must be removed," according to the regulation, "when it poses a threat to release airborne asbestos fibers and it can't be reliably repaired or removed."  Id., Section A.2.b.(1).  A "must remove" mandate must be given by the bioenvironmental engineer "based on a direct evaluation of the facility."  Id.  In all other cases, i.e., "[w]hen there is no compelling mandate to remove asbestos," decisions to remove or repair damaged "friable

25 - OPINION AND ORDER

asbestos" "should be based on degree of risk to facility occupants, use of facility, feasibility of repair, frequency of repair, and cost-effectiveness." Id., Section A.2.b.(2).

The regulation assigns certain responsibilities. As mentioned earlier, the Air Force Engineering and Services Center was to "[f]ormulate policies and guidance necessary for bases to develop and maintain a viable facility asbestos management program," and "[u]ndertake management and technical initiatives to help the MAJCOMs [major commands] implement facility asbestos management." Id., Section A.3.a.

The base civil engineer, or BCE, was the person actually in charge of the asbestos program. For the HIANG, that person was Major Alvin Satagota of the HIANG. The BCE was, among other things, assigned responsibility to appoint the asbestos program officer and operations officer, develop the asbestos management plan, develop and implement a comprehensive written asbestos operating plan, and:

> [w]ith the base bioenvironmental engineer, examine[] friable ACM and make[] professional judgments concerning whether repair, maintenance, or removal of the material is required; whether extraordinary precautions, such as frequent monitoring, removal of personnel from the area, temporary controls, or other protective measures are required to protect personnel until recommended actions are completed.

Id., Section A.3.c.(4).

As explained earlier in this opinion, testing from the 1980s through the early 2000s never showed hazardous concentrations of airborne asbestos fibers. Consequently, the base bioenvironmental engineer was never required to give a "must remove" mandate. Instead, as permitted by the regulations and based on surveys of the facilities, which were in fact done repeatedly, the BCE and base environmental engineer considered the degree of risk to facility occupants, use of facility, feasibility of repair, frequency of repair, and cost-effectiveness with

26 - OPINION AND ORDER

respect to proposals to remove, repair, or manage in place damaged asbestos -- friable or otherwise -- at Hickam AFB.   Exhibit A, Section A.2.b.(2).

With respect to the issue of "friable" asbestos, plaintiffs make much of the inconsistent positions of Major Martinez-Perez, the USAF bioenvironmental engineer in 1986, and Major Stephen Payne, USAF bioenvironmental engineer in 1990, as to whether the asbestos in Hangar 3400 was "friable."  In 1986, Martinez-Perez described the material as "in a friable condition." Exhibit C, p. 453.  In 1990, Payne stated that "[i]n its current state I do not consider the subject ACM to be 'friable.'"  Exhibit C, p. 276.  And in his declaration, Colonel Compton, the HIANG Environmental Coordinator in 1992, states that "to the best of his knowledge," the ACM in Hangar 3400 "was never friable during the time that Mr. Byington worked in the hangar." Compton Decl., ¶ 8, Exhibit F to Defendant's Concise Statement.

Whether the asbestos was or was not friable, however, does not answer any question with respect to the discretionary function exception:  Nothing in the regulations made the label "friable" determinative of whether the HIANG BCE and/or base environmental engineer were required to issue a "must remove" mandate; to the contrary, the regulations gave wide discretion to make "professional judgments" as to how best to deal with it.  See Exhibit A, Section A.3.c.(4), quoted supra.

In summary, no statute, rule, regulation, etc., mandated defendant (or the HIANG, for that matter) to take any particular action with respect to ACM in the leased Hickam AFB facilities during the relevant time frame.

3.    Were the Decisions Concerning How to Handle the Asbestos, by Removal, Encapsulation, or Monitoring, Susceptible to Policy Analysis?

27 - OPINION AND ORDER

Even where the alleged wrongful conduct did <u>not</u> violate a specific and mandatory regulation or statute, the court still must consider the second step of the two-step discretionary function analysis, which asks whether the challenged action was susceptible to policy analysis, that is, involved a decision grounded in social, economic, or political policy. <u>See, e.g.</u>, <u>O'Toole</u>, <u>supra</u>, 295 F.3d at 1033-34.

The evidence of record compels the conclusion that defendant's and the HIANG's ongoing debate over how best to address ACM at Hickam AFB involved decisions that are susceptible to policy analysis. Indeed, the various issues considered with respect to the encapsulation, removal, or management of the ACM demonstrate that there were a variety of possible responses that could be taken, and that any decision concerning what approach to take involved weighing perceived risks against priorities in utilizing limited resources and the potential for interference with the core mission of the HIANG. These issues included:

- no measurable health hazard detected (Exhibit C, throughout);

- a major concern was the F-15 conversion, which begins fiscal year 1987 (2nd quarter). "Any closure of the Hangar during this period would impact our conversion." (<u>id</u>., p. 281);

- encapsulation would be very expensive ($500K) and provide only a temporary fix (<u>id</u>. p. 279);

- encapsulation followed by removal would quadruple the cost (<u>id</u>.);

- no guarantee encapsulate would last more than two years (<u>id</u>., pp. 334, 333);

- great potential for delamination if encapsulated (<u>id</u>., p. 279);

- constant tradewinds would cause the encapsulate to flex (<u>id</u>., p. 322);

28 - OPINION AND ORDER

- salt air could react with the encapsulate and break it down (id.);

- building vibrations caused by engine run-ups could stress the material (id.);

- weight of the material would likely cause it to fail (id.);

- complete removal would disturb the asbestos, and there would always be residual asbestos in the girders; therefore, management in place recommended (id., p. 273);

- asbestos removal could create a greater asbestos hazard due to the difficulty in removing all material -- a definite airborne asbestos problem (id., p. 488)

- asbestos removal would destroy the fire rating of the structure (id.)

- asbestos removal would create a tremendous corrosion control problem since the structure is located 100 yards from the ocean with prevailing winds off the water (id.);

- because the ACM posed no significant hazard in the present or foreseeable future, health concerns could not justify the expenditure:  "only reasons * * * are first, peace of mind, where we would remove the asbestos in order to eliminate the possibility of any problems in the future, or second, if we had funds specifically for this type of work that required expenditure (id., p. 272);

- if encapsulation not an option, recommend continued monitoring by the Hickam bioenvironmental engineer until the airborne asbestos level reaches one-half the permissible exposure limit as defined (never reached)(id., p. 283).

29 - OPINION AND ORDER

Moreover, as discussed above, defendant's decision to require the HIANG to assume responsibility for management of asbestos in the leased facilities as well as for worker safety was a policy-based discretionary decision of the type defendant was authorized to make.

As defendant summarizes it, under the license agreement, the statutes, and the regulations,

> if the HIANG did not agree with the local USAF recommendations, it was free to take a different route or abandon its license. But, at bottom, it does not matter whether the USAF or the HIANG was the final arbiter of how to respond to the presence of asbestos, for the response taken was **not** constrained by any mandatory obligation and the actions of the [defendant] were susceptible to, and clearly based upon, policy considerations of the type that Congress intended, and courts have found, fall with the ambit of protected government discretion.

Defendant's Reply, p. 7 (emphasis in original).

In summary, I find that defendant has met its burden of establishing that it is entitled to invoke the discretionary function exception under the FTCA for its actions or inactions with respect to asbestos at the HIANG. Therefore, this court lacks subject matter jurisdiction over plaintiffs' claims, and, consequently, I grant defendant's motion for summary judgment. The motion to dismiss is denied as moot.

30 - OPINION AND ORDER

CONCLUSION

Defendant's Motion to Dismiss and Alternative Motion for Summary Judgment (# 20) is granted with respect to the motion for summary judgment and denied as moot with respect to the motion to dismiss.  Any other pending motions are denied as moot, and this action is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED.

DATED this 12th day of June, 2007.


 /s/ Robert E. Jones
ROBERT E. JONES
U.S. District Judge